UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| BERNICE GARZA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:18-CV-249 |
| | § | |
| OMAR ESCOBAR JR., *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

The Court now considers the "Motion for Judgment on the Pleadings"[1] brought by Omar Escobar, Jr. and Starr County, Texas (collectively "Defendants"); the response, as amended, filed by Bernice Garza ("Plaintiff");[2] as well as the reply filed by Defendants.[3] The Court also considers "All Parties' Unopposed Joint Motion for Stay" filed by the parties.[4] After duly considering the record and relevant authorities, the Court **GRANTS** Defendants' motion for judgment on the pleadings, and **DENIES as moot** the parties' motion for a stay.

### I. BACKGROUND

This is a civil rights employment discrimination case, and the instant motion concerns whether Plaintiff was protected from 'patronage dismissal,' that is whether she is protected under the First Amendment from termination due to political differences.[5] In overview, Plaintiff alleges that she and her former boss, Defendant Omar Escobar, Jr. ("Escobar"), District Attorney of Starr County, "were friends and were aligned with respect to local politics for several years" but

---

[1] Dkt. No. 12.
[2] *See* Dkt. No. 15 (amended response); *see also* Dkt. No. 13 (original response).
[3] Dkt. No. 17.
[4] Dkt. No. 20.
[5] *See* Dkt. No. 12.

that the "friendly relationship" ceased in 2017 due to "political events,"[6] eventually leading to Plaintiff's dismissal.[7]

Specifically, Plaintiff alleges that she, along with her sister, Leticia Garza Galvan ("Galvan"), supported Escobar's campaign for District Attorney in 2012,[8] and Plaintiff served as a "determined and conscientious organizer and campaign worker" for Escobar's campaign and other related political campaigns.[9] In January 2014, Plaintiff was hired by Starr County as a Federal and State Projects Manager,[10] and in February 2015 Plaintiff was transferred at Escobar's request to the District Attorney's Office to serve as the Coordinator of the Crime Victims Unit ("CVU").[11] Plaintiff was the head of the CVU department and supervised five employees.[12] According to Plaintiff's complaint, the CVU was responsible for "communicating with and assisting crime victims," and Plaintiff additionally was responsible for preparing and managing grant requests.[13]

While CVU coordinator, Plaintiff alleges she worked for Escobar's political re-election campaign in 2016,[14] and that after the 2016 election Escobar continued to involve Plaintiff in his political plans, including discussing which candidates for political office Escobar supported and wanted Plaintiff to support.[15] The relationship at this point was still friendly and on June 12, 2017, Plaintiff received a $5,000 annual pay increase, at Escobar's request.[16]

---

[6] See Dkt. No. 1 p. 2, ¶ 6.
[7] See id. at pp. 2–14.
[8] It is unclear from Plaintiff's complaint, but it appears that this campaign was Escobar's successful campaign for District Attorney of Starr County.
[9] Dkt. No. 1 p. 2, ¶ 6.
[10] Id. ¶ 7.
[11] Id. at p. 3, ¶ 8.
[12] Id. at p. 3, ¶ 9.
[13] Id. ¶¶ 9–11.
[14] Dkt. No. 1 pp. 3–4, ¶¶ 13–14.
[15] Id. at p. 4, ¶ 15.
[16] Id. ¶ 16.

However, Plaintiff alleges her relationship with Escobar "began to deteriorate soon thereafter" because Escobar "objected to the political views and activities of Plaintiff and her family and associates."[17] Plaintiff alleges "a rift" developed when Plaintiff's sister, Galvan, engaged in political activities that Escobar disagreed with, including Galvan's desire to run for political office on a slate of candidates opposed to Escobar.[18] As a result of this rift, Escobar began to harass Plaintiff at work including by criticizing Galvan daily to Plaintiff at the office and that due to this harassment "Plaintiff became so distressed that she had to start taking medication."[19] On April 14, 2017, Plaintiff alleges she had a meeting with Escobar where she told him "she wanted to keep doing her job, but did not want to discuss politics any further."[20]

On or about September 5, 2017, Plaintiff alleges Escobar ordered Plaintiff to attend a meeting with two of his Assistant District Attorneys and the County Auditor, but Plaintiff objected and did not attend.[21] Plaintiff further alleges that Escobar met with her to discuss her failure to attend the meeting with the County Auditor, and in that discussion she told Escobar she did not know anything about the meeting, and reminded Escobar "she had said she did not want to discuss politics."[22] Plaintiff alleges Escobar responded by informing Plaintiff she would "need to be out of the office" if Plaintiff assisted Galvan in her political campaign.[23]

Plaintiff alleges Escobar's harassment at work increased after this incident.[24] The harassment included removing work duties from Plaintiff, such as assigning subordinates to take the lead in preparing crime victims for trial, even though "Plaintiff ha[d] more experience and

---

[17] *Id.* at p. 5, ¶ 17.
[18] *See id.* at pp. 5–8.
[19] *Id.* at p. 6, ¶ 21.
[20] Dkt. No. 1 p. 6, ¶ 24.
[21] *Id.* at pp. 8–9.
[22] *Id.* at p. 9, ¶ 39.
[23] *Id.* ¶ 41.
[24] *See id.* at pp. 10–12.

the subordinates were not equipped to do it on their own."[25] Plaintiff alleges she ignored Escobar's order and still helped with the trial preparations.[26] However, Plaintiff alleges that "[f]or the most part, Plaintiff was relegated to sitting at her desk doing nothing except work related to the grants."[27] Plaintiff alleges "it was more important to Escobar to punish an employee's political disloyalty outside of the office than it was to ensure the efficient and effective functioning of the [CVU]."[28]

Galvan continued her political ambitions and "began to actively campaign and raise money" for her political campaign, and "Escobar's retaliation continued to escalate."[29] Plaintiff alleges there had been "little to no direct communication" between Escobar and Defendant since the September 5, 2017 discussion, but that Escobar "began sending cryptic messages intended to intimidate Plaintiff from assisting in her sister's campaign."[30]

 By mid-December 2017, Plaintiff alleges she was "still going in to the office, but was mostly working half-days . . . The atmosphere was tense and awkward around the office with no communication with Escobar, despite Plaintiff still being the titular head of the CVU and drawing her regular salary."[31] Plaintiff requested—and was granted—leave without pay from January 3, 2018 to March 18, 2018.[32]

However, when Plaintiff returned to work on March 19, 2018 she was suspended without pay, and then subsequently terminated.[33] On April 10, 2018, Plaintiff returned to the office to

---

[25] *Id.* at p. 10, ¶ 45.
[26] Dkt. No. 1 p. 10, ¶ 45.
[27] *Id.*
[28] *Id.* ¶ 46
[29] *Id.* at p. 11, ¶ 53.
[30] *Id.* ¶ 54.
[31] *Id.* at p. 12, ¶ 58.
[32] Dkt. No. 1 p. 12, ¶ 59.
[33] *Id.* at pp. 13–14.

return all office-issued equipment and as she was leaving, Plaintiff alleges the Human Resources Director, Armandina Martinez, stated, "Politics [Plaintiff], that is the way it is here. I'm sorry."[34]

On these facts, Plaintiff filed a complaint in this Court alleging constitutional violations under 42 U.S.C. § 1983.[35] Specifically, Plaintiff alleges retaliation in violation of her First Amendment rights to political association and freedom of speech.[36] Plaintiff brings a claim against Starr County and claims against Escobar in his official and personal capacities.[37] Plaintiff seeks damages, and any other relief to which she may be entitled.[38]

Defendants filed the instant motion for judgment on the pleadings,[39] Plaintiff untimely responded,[40] and requested leave to file an amended response.[41] The Court granted Plaintiff leave to file her amended response,[42] and thus considers Plaintiff's amended response[43] herein. Defendants replied.[44] The Court now turns to its analysis.

## II.   LEGAL STANDARD

Rule 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings."[45] The motion "should be granted only if there is no issue of material fact and if the pleadings show that the moving party is entitled to prevail as a matter of law."[46] Accordingly, a motion for judgment

---

[34] *Id.* at p. 14, ¶ 71.
[35] *See* Dkt. No. 1.
[36] *Id.* at pp. 14–16.
[37] *Id.* at p. 2, ¶¶ 4–5.
[38] *Id.* at p. 16.
[39] Dkt. No. 12.
[40] Dkt. No. 13.
[41] Dkt. No. 14.
[42] Dkt. No. 16.
[43] Dkt. No. 15.
[44] Dkt. No. 17.
[45] *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam).
[46] *Greenberg v. Gen. Mills Fun Grp., Inc.*, 478 F.2d 254, 256 (5th Cir. 1973) (per curiam).

on the pleadings under Rule 12(c) is analyzed under the standard utilized in a Rule 12(b)(6) motion to dismiss.[47]

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[48] This does not require detailed factual allegations, but it does require "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[49] Courts first disregard from their analysis any conclusory allegations as not entitled to the assumption of truth,[50] but regard well-pled facts as true, viewing them in the light most favorable to the plaintiff.[51] Courts then undertake the "context-specific" task of determining whether the remaining well-pled allegations give rise to an entitlement to relief that is plausible, rather than merely possible or conceivable.[52]

## III.   ANALYSIS

Defendants argue that Plaintiff's claims against Starr County and Escobar should be dismissed because Plaintiff's position is not protected from patronage dismissal and therefore Plaintiff fails to state a claim under the First Amendment. Specifically, Defendants argue that Plaintiff's allegations regarding her position, and the statutory description[53] of the responsibilities of Plaintiff's position, support finding that Plaintiff's job is one in which "political loyalty is a legitimate qualification for continued employment,"[54] and thus is not

---

[47] *See Doe v. MySpace, Inc*., 528 F.3d 413, 419 (5th Cir. 2008) ("A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6).").
[48] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007), *cert. denied*, 552 U.S. 1182 (2008) (internal quotations omitted).
[49] *Twombly*, 550 U.S. at 555.
[50] *See Ashcroft v. Iqbal,* 556 U.S. 662, 678–679 (2009).
[51] *Id.*
[52] *See id*. at 679–80.
[53] Defendants argue Plaintiff's position is statutorily defined in TEX. CODE CRIM. PROC. art. § 56.04. Plaintiff does not contest this. *See* Dkt. No. 15 p. 12. Accordingly, this is judicially noticed pursuant to Fed. R. Evid. 201.
[54] Dkt. No. 12 p. 2.

protected from dismissal due to political differences. Defendants further argue that even if Plaintiff establishes a constitutional violation, Escobar is entitled to qualified immunity.[55]

Plaintiff brings procedural and substantive arguments. Procedurally, Plaintiff argues that there is insufficient information in the pleadings to make a determination regarding whether Plaintiff's position is subject to patronage dismissal.[56] Substantively, Plaintiff responds that political affiliation is not relevant to her former position and thus she is entitled to First Amendment protection.[57] Specifically, Plaintiff argues that she need only establish a *prima facie* case of First Amendment retaliation, and that Defendants do not meet their burden under *Pickering v. Board of Education* of demonstrating that the government's interest in ensuring effective governance outweighs Plaintiff's First Amendment rights.[58] Plaintiff also argues that Defendants do not show that Plaintiff was a policymaker or a confidential employee.[59] Finally, Plaintiff responds that Defendant Escobar is not entitled to qualified immunity because Plaintiff states a plausible claim for relief.[60]

The Court first considers Plaintiff's procedural argument and then considers the substance of Plaintiff's claims.

i.     *Plaintiff's Procedural Argument*

Before analyzing whether Plaintiff's position may be subject to patronage dismissal, the Court considers whether Defendants' motion may be considered at this stage in the proceedings. Plaintiff argues there is insufficient information in the pleadings to make a determination about Plaintiff's position at the motion to dismiss stage.[61]

---

[55] *Id.* at p. 8.
[56] Dkt. No. 15 p. 14.
[57] *See id.*
[58] *Id.* at p. 9.
[59] *Id.* at pp. 8–14.
[60] *Id.* at p. 16.
[61] *See* Dkt. No. 15 p. 14.

The Court disagrees. Plaintiff concedes the responsibilities of her position are defined under Texas statutory law.[62] Additionally, Plaintiff's complaint contains numerous allegations regarding the requirements of her former job.[63] The Court finds that these provide sufficient information to determine whether Plaintiff's allegations state a claim. Plaintiff does not attack the veracity of any of Defendants' statements regarding her position and its responsibilities, nor does she indicate what additional information may be required to determine whether her position should be protected from patronage dismissal. Finally, although patronage dismissal cases are often considered via summary judgment, many courts review such claims via a motion to dismiss.[64]

Thus, the Court finds there is sufficient information in the pleadings to rule on Defendants' motion for judgment on the pleadings. Accordingly, the Court now determines whether Plaintiff's substantive allegations state any plausible claim for relief. Plaintiff brings official and individual capacity claims against Escobar and a claim against Starr County. The Court will begin with Plaintiff's claims against Escobar and then turn to Plaintiff's remaining claim against Starr County.

### ii. Official Capacity Claim Against Escobar

As an initial matter, the Court considers Plaintiff's official capacity claim against Escobar. A plaintiff may bring 42 U.S.C. § 1983 claim against a person in his individual or official capacity, or against a local government entity.[65] A § 1983 suit against a person in his official capacity is a suit against his office, and is no different from a suit against the entity

---

[62] Dkt. No. 15 p. 12. *See* TEX. CODE CRIM. PROC. art. § 56.04.
[63] *See* Dkt. No. 1.
[64] *See, e.g., Gentry v. Lowndes Cty.*, 337 F.3d 481, 489 (5th Cir. 2003) (reversing a district court denial of a motion to dismiss because the Fifth Circuit found the county road manager and administer positions were not protected from patronage dismissal); *see also Rutan v. Republican Party,* 497 U.S. 62, 65 n.1 (1990).
[65] *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978) (municipalities and other local government units are "persons" subject to suit under § 1983).

itself.[66] Thus, the Fifth Circuit has held it appropriate to dismiss claims against officers in their official capacities when the "allegations duplicate claims against the respective governmental entities themselves."[67]

Here, Plaintiff brings claims against Escobar in his official capacity and against Starr County.[68] Because Plaintiff's official capacity claim against Escobar is duplicative of her claim against Starr County, this claim is **DISMISSED WITH PREJUDICE.**

### iii. Individual Capacity Claim Against Escobar

The Court next considers Plaintiff's claim against Escobar in his individual capacity. Plaintiff broadly alleges that Escobar retaliated against her and then dismissed her because of her lack of political loyalty. The Court will begin by considering the correct legal standard for evaluating Plaintiff's claim and then analyze the relevant First Amendment law regarding patronage dismissal.

Beginning with *Pickering v. Board of Education*, the Supreme Court has utilized a balancing test for First Amendment retaliation cases and held that the First Amendment precludes the discharge of public employees for exercising their First Amendment right to free speech if two criteria are satisfied: (1) the speech relates to a matter of public concern; and (2) the employee's interest in commenting upon matters of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees.[69]

In weighing these concerns, "termination of employees for political reasons," otherwise known as patronage dismissal, is "presumptively violative of the First Amendment."[70] In *Elrod*

---

[66] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

[67] *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001).

[68] Dkt. No. 1 p. 2, ¶¶ 4–5.

[69] *Brady v. Ft. Bend Cnty.*, 145 F.3d 691, 704 (5th Cir. 1998) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)); *see also Connick v. Myers*, 461 U.S. 138 (1983).

[70] *Correa v. Fischer*, 982 F.2d 931, 933 (5th Cir. 1993).

*v. Burns*, the Supreme Court held that because "political belief and association constitute the core of those activities protected by the First Amendment,"[71] the practice of patronage dismissal "clearly infringes First Amendment interests."[72]

However, the Supreme Court has found that the government's interest in efficient administration may outweigh that of an employee's First Amendment rights in certain circumstances. In *Elrod*, the Supreme Court ruled that dismissals of public employees on the basis of political activities would be permissible in some cases in order to ensure that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration . . . ."[73] In *Branti v. Finkel*, the Supreme Court expanded on this analysis and held that if "an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interests in maintaining governmental effectiveness and efficiency."[74] The Supreme Court has further clarified that "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, *unless* party affiliation is an appropriate requirement for the position involved."[75]

Interpreting this precedent, the Fifth Circuit applies "a case-by-case balancing test to determine whether an employee's interest in commenting upon matters of public concern outweighs the interest of the State in promoting the efficient delivery of public services."[76] Thus, the Fifth Circuit "places cases involving only political association, only speech, or a combination

---

[71] 427 U.S. 347, 356 (1976).
[72] *Id.* at 360.
[73] *Id.* at 367.
[74] 445 U.S. 507, 517 (1980).
[75] *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (emphasis added).
[76] *Wiggins v. Lowndes Cty.*, 363 F.3d 387, 390 (5th Cir. 2004) (citing *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991)); *see also Connick*, 461 U.S. at 152; *Pickering*, 391 U.S. at 568.

of the two on a spectrum."[77] When cases fall within the spectrum, the *Pickering* "balancing constitutes the appropriate inquiry."[78]

However, some cases are located on an extreme end of the spectrum. One such factual scenario occurs in political affiliation cases.[79] Where an employee is dismissed solely because of the employee's political affiliation, the employee prevails with "little, if any, weighing,"[80] unless the position is one in which political affiliation is a necessary job requirement then, "the government's interests more easily outweigh the employee's (as a private citizen)."[81] Thus, "[w]here a public employee is demoted for supporting an elected official's political rival, the key factor in the balancing test is whether political allegiance 'is an appropriate requirement for the effective performance of the public office involved.'"[82] The Fifth Circuit "has recognized that the *Elrod/Branti* doctrine applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party."[83]

Here, Plaintiff alleges she was retaliated against and then terminated because of her political associations, and that Escobar explicitly told her on several occasions that he was taking action against her because of her political activities. The Court agrees with Plaintiff that her allegations support a *prima facie* case that she was dismissed because of her political activities, and thus her termination is presumptively violative of the First Amendment.[84]

---

[77] *Gentry*, 337 F.3d at 485-86 (citing *Kinsey v. Salado Indep. Sch. Dist.*, 950 F.2d 988, 993-94 (5th Cir. 1992) (en banc)).

[78] *Brady*, 145 F.3d at 705; *see also Gentry*, 337 F.3d at 486.

[79] *Grogan v. Lange*, 617 F. App'x 288, 291 (5th Cir. 2015); *Gentry*, 337 F.3d at 485-86 (5th Cir. 2003) at 486.

[80] *Kinsey*, 950 F.2d at 993 (quoting *McBee v. Jim Hogg Cty.*, 730 F.2d 1009, 1014 (5th Cir. 1984)).

[81] *Brady*, 145 F.3d at 707–708 (quoting *Kinsey*, 950 F.2d at 994).

[82] *Wiggins*, 363 F.3d at 390 (citing *Branti*, 445 U.S. at 518); *see also Maldonado v. Rodriguez*, 322 F. Supp. 3d 753, 765 (S.D. Tex. 2017) (noting that each Plaintiff "occupies a place within th[e] spectrum, necessitating application of the *Pickering-Connick* balancing test.").

[83] *Jordan v. Ector Cnty.*, 516 F.3d 290, 295–96 (5th Cir. 2008) (internal quotation marks, footnote, and citations omitted).

[84] *See Correa*, 982 F.2d at 933 ("[I]f the plaintiffs present evidence supporting the contention that they were fired because of their political affiliation or political beliefs, the plaintiffs would state a viable claim under the First Amendment.").

However, Plaintiff is incorrect that Defendants may only prevail if they demonstrate Plaintiff's claim fails each of the factors outlined in a *Pickering* balancing analysis. In cases of patronage dismissal, claims "'locate themselves on a spectrum'"[85] and the *Pickering* balance is guided by this spectrum.[86] Here, Plaintiff's claims are such that the employee prevails with "little, if any, weighing."[87] Indeed, Plaintiff's allegations are presumed to state a claim *unless* Defendants demonstrate that Plaintiff's position falls into the *Elrod/Branti* exception that allows for patronage dismissal.[88]

Thus, the Court need not consider all the factors under the *Pickering* balancing analysis;[89] rather the "key factor"[90] is whether Plaintiff's position is one in which "party affiliation is an appropriate requirement for the position involved."[91] The Court now turns to this issue.

### a.   Patronage Dismissal Exception

The patronage dismissal exception as described in *Elrod/Branti* applies generally to public employees who are either in policy making positions or in positions which require access to confidential materials or documents.[92] "A policymaker is an employee 'whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy,

---

[85] *Brady*, 145 F.3d at 704 (quoting *McBee*, 730 F.2d at 1014).

[86] *Jordan*, 516 F.3d at 296.

[87] *Kinsey*, 950 F.2d at 993 (5th Cir. 1992); *see also Burnside v. Kaelin*, 773 F.3d 624, 628 (5th Cir. 2014) ("In stating a prima facie case at the motion-to-dismiss stage of a case, there is a rebuttable presumption that no balancing is required to state a claim.").

[88] *See O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 719 (1996) (noting that in "*Elrod* and *Branti* . . . the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed. . . on the other hand . . . the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required.").

[89] *See, e.g., Soderstrum v. Grand Isle*, 925 F.2d 135, 141 (5th Cir. 1991) (holding that the personal secretary of a sheriff is not protected from patronage dismissal and conducting no *Pickering* balancing); *Aucoin*, 306 F.3d at 274 (noting that for policymaker or confidential employees "government interests more easily outweigh the employee's" and conducting no *Pickering* balancing).

[90] *Maldonado*, 322 F. Supp. 3d at 765.

[91] *Rutan*, 497 U.S. at 64.

[92] *Wiggins*, 363 F.3d at 390 (noting that while policymaker and confidential employee are not strictly applied, the Fifth Circuit "more readily find that the government's interests outweigh the employee's interests where the employee is a policymaker or is confidential.").

and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors.'"[93] In *Elrod*, the Court stated:

> No clear line can be drawn between policymaking and non-policymaking positions . . . An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.[94]

Confidential employees also may be subject to patronage dismissals; one is a confidential public employee if "he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, e.g., as a private secretary to a policymaker."[95] Ultimately, however, the inquiry "is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that [political] affiliation is an appropriate requirement for effective performance of the public office involved."[96]

District attorneys and other government attorneys are positions that "[f]ederal courts have uniformly held . . . inherently demand[s] political loyalty and that . . . thus fall within the *Branti* exemption from First Amendment protection."[97] In line with this reasoning, in *Aucoin v. Haney*, the Fifth Circuit found that because of the "broad duties and the important policymaking role of a district attorney and his designated assistants . . . an assistant district attorney falls within the

---

[93] *Id.* at 390 (quoting *Stegmaier v. Trammell*, 597 F.2d 1027, 1035 (5th Cir. 1979)).
[94] *Elrod*, 427 U.S. at 367–68 (citation omitted).
[95] *Stegmaier*, 597 F.2d at 1040 (citation omitted).
[96] *Brady*, 145 F.3d at 709 (quoting *Branti*, 445 U.S. at 518).
[97] *Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 169 (E.D.N.Y. 2005); *see e.g., Aucoin v. Haney*, 306 F.3d 268, 275 (5th Cir. 2002) (collecting cases); *Gordon v. Cty. of Rockland*, 110 F.3d 886, 890 (2d Cir. 1997) ("All circuit court decisions—and almost all other court decisions—involving attorneys in government service, other than public defenders, have held that *Elrod/Branti* do not protect these positions.") (citation omitted).

*Elrod/Branti* policymaker exception."[98] However, the title of the position is not dispositive as to whether it is protected from patronage dismissal. For example, the Fifth Circuit has applied the exception to various positions, including deputy circuit clerk, personal secretary to the police chief, and school superintendent.[99]

In evaluating whether a position is subject to the *Elrod/Branti* exception, courts consider the "duties inherent in the position, rather than the actual duties performed by the employee."[100] The inquiry is case specific, and courts have considered a number of duties when determining whether a position is one in which political loyalty is an inherent requirement. Numerous federal courts have held that employees serving a government in "representative," "spokesperson," or "liaison" capacities are exempt from First Amendment protection under *Branti* and its progeny.[101] The Sixth Circuit has noted that "as political action cannot occur without communication, a position that controls the lines of communication of a political actor must be inherently political"; such a position "involves access to confidential and political material, and political loyalty, whether partisan or personal, is an essential attribute of the job."[102] For similar reasons, numerous courts have found that the ability to make budgetary decisions contributes to finding that a position is one in which political affiliation is a necessary job requirement.[103] The

---

[98] 306 F.3d 268, 276 (5th Cir. 2002).

[99] *See, e.g., Stegmaier*, 597 F.2d at 1040 (deputy circuit clerk falls within exception as a "confidential employee"); *Soderstrum*, 925 F.2d at 141 (personal secretary to police chief found to be a confidential employee); *Kinsey*, 950 F.2d at 995 (school superintendent found to be within exception), *cert. denied*, 504 U.S. 941 (1992).

[100] *Cudd v. Aldrich*, 982 F. Supp. 463, 467 (S.D. Tex. 1997).

[101] *See, e.g., McBee*, 703 F.2d at 842 (noting that as "representatives of this sheriff to the public" deputies and dispatchers in a small office fell into the *Elrod/Branti* exception); *Gordon*, 110 F.3d at 890 (employees who represented county in meetings with elected officials exempted); *Aiken v. Rio Arriba Bd. of County Comm'rs*, 134 F. Supp.2d 1216, 1222 (D.N.M. 2000) (same); *Hoard v. Sizemore*, 198 F.3d 205, 215 (6th Cir. 1999) ("Given . . . the fact that the assistant road foreman may be called upon to serve as the executive's liaison with the public as far as road conditions are concerned, the position can only be seen as inherently political.").

[102] *Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 914 (6th Cir. 1991).

[103] *See e.g., Gentry,* 337 F.3d at 488 (considering the duty of "preparing a budget" as one factor in finding that a county administrator may be subjected to patronage dismissal); *Wiggins*, 363 F.3d at 390 (noting that "helping prepare a budget" was one factor in determining that a road manager is subject to patronage dismissal); *Flores v. Sanchez*, No. EP-04-CA-056-PRM, 2005 U.S. Dist. LEXIS 15417, at *24 (W.D. Tex. July 29, 2005) (finding an

Sixth Circuit observed that "budgetary decisions are among the most significant, and the most political, actions which government officials take."[104]

The need for a close working relationship is another consideration. The Supreme Court has stated "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."[105] In that line, the Fifth Circuit has noted that for "close working relationships" to be deemed "essential," the particular speech must "sufficiently disrupt[] the working relationship as to prevent effective performance . . . ."[106] Where an elected official is required by statute to appoint deputies or assistants, courts have found that such positions may be excepted from First Amendment protection to ensure the appointed individual carries out the policies of the elected official. For example, the Fifth Circuit found that a deputy circuit clerk who was appointed by the elected circuit clerk was not protected from patronage dismissal because the circuit clerk had to be able to select a deputy "in whom he has total trust and confidence and from whom he can expect, without question, undivided loyalty."[107] Similarly, the Ninth Circuit found that confidential secretaries were also not protected from patronage dismissal because the positions were "critical to effective policy implementation," and "loyalty and confidentiality" were "necessary."[108]

Finally, the analysis does not end upon finding that a position may fall within the *Elrod/Branti* exception. Although "[a] position of trust and confidence limits the employee's right to engage in political activity against his superiors, . . . the position 'does not immunize

---

office manager not protected from patronage dismissal and considering as one factor that the officer manager "assists with the preparation of an annual budget"); *Bauer v. Saginaw Cty.*, 641 F. App'x 510, 515 (6th Cir. 2016) (legal office manager fell within the *Elrod/Branti* exception because the position was "one with significant discretionary authority that includes . . . handling the. . . budget.").

[104] *Peterson v. Dean*, 777 F.3d 334, 347 (6th Cir. 2015).
[105] *Connick*, 461 U.S. at 151–52.
[106] *McBee*, 730 F.2d at 1017.
[107] *Stegmaier*, 597 F.2d at 1040.
[108] *Hobler v. Brueher*, 325 F.3d 1145, 1151-52 (9th Cir. 2003).

public employer action unconnected to and unmotivated by [the] need for political loyalty.'"[109] Even where a court determines that a position falls within the policymaker exception, "unless the [employee's] activities had in some way disrupted" the functioning of the government's office, the government may not retaliate against the employee for exercising his or her First Amendment rights.[110]

Here, Plaintiff is the Coordinator of the Crime Victim Unit and describes her job responsibilities as follows:

> As Coordinator of the CVU, Plaintiff was the head of that department and supervised five employees. Plaintiff was also in charge of accepting interns. Defendant Escobar would make the final hiring decisions, but Plaintiff made recommendations.
>
> The CVU shoulders the important responsibility of communicating with and assisting crime victims. These are largely victims of domestic violence and sexual assault. Among other things, the CVU assists these vulnerable victims by securing counseling services and preparing them to testify at trial.
>
> Plaintiff also served as the grant manager for the 229th Judicial District Attorney's Office, preparing and managing grant requests.[111]

Additionally, Plaintiff's job duties are defined under Texas statutory law.[112] Texas law dictates that Plaintiff's job was to ensure that crime victims were afforded their statutory rights and to "work closely with appropriate law enforcement agencies, prosecuting attorneys, the Board of Pardons and Paroles, and the judiciary in carrying out that duty."[113]

Considering these job responsibilities, the Court finds Plaintiff's position is such that political loyalty was an appropriate job requirement. First, Plaintiff's position is "not well

---

[109] *Gentry*, 337 F.3d at 488 (quoting *Bonds v. Milwaukee County*, 207 F.3d 969, 979 (7th Cir. 2000)).

[110] *Vojvodich v. Lopez*, 48 F.3d 879, 887 (5th Cir. 1995); *see also Grogan v. Lange*, 617 F. App'x 288, 292 (5th Cir. 2015) (noting that a policymaker's role must "necessitate[] an allegiance" to the government office before falling within the *Elrod/Branti* exception).

[111] Dkt. No. 1 p. 3, ¶¶ 9–11.

[112] *See* Tex. Code Crim. Proc. art. § 56.04(a) ("The district attorney, criminal district attorney, or county attorney who prosecutes criminal cases . . . shall designate a person to serve as victim assistance coordinator . . . .").

[113] *Id.* § 56.04(b).

defined" and provides a "broad scope" of responsibilities, which makes it "more likely" that Plaintiff functions as a policymaker.[114] She was required under the statute to ensure victim's rights were protected and to work closely with law enforcement, including prosecuting attorneys, to protect those rights.[115] Fulfilling these duties "require[s] more than simple ministerial competence."[116] Accordingly, the Court finds Plaintiff's position allocated Plaintiff a large amount of discretion and required her to make decisions similar to those made by a policymaker.

Furthermore, Escobar is statutorily required to designate an individual for Plaintiff's position.[117] Plaintiff, as both the public face of the district attorney to vulnerable victims of crimes and the member of the district attorney's office responsible for preparing those victims for trial, was in charge of implementing the district attorney's policies and goals.[118] Plaintiff supervised five employees to carry out this mission.[119] Thus, like a deputy circuit clerk, Plaintiff's position is one which a district attorney needs to be able to appoint an individual in "whom he has total trust and confidence . . . ."[120]

Additionally, although Plaintiff was not herself an attorney, her position required working closely with government attorneys. Plaintiff's job required handling sensitive and confidential information, and making discretionary decisions about that information. The necessity for Plaintiff to maintain confidentiality and to work closely with government attorneys supports finding that, like district attorneys, her position is one that "inherently demand[ed] political loyalty" in order to carry out the goals of the district attorney's office.[121]

---

[114] *See Elrod,* 427 U.S. at 367–368.
[115] *Id.*
[116] *Stegmaier*, 597 F.2d at 1035.
[117] *See* TEX. CODE CRIM. PROC. art. § 56.04(a).
[118] Dkt. No. 1 p. 4, ¶ 9.
[119] *Id.*
[120] *Stegmaier*, 597 F.2d at 1040.
[121] *See, e.g., Aucoin*, 306 F.3d at 275 (collecting cases); *Gordon*, 110 F.3d at 890; *Alberti*, 393 F. Supp. 2d at 169.

The communication aspect of Plaintiff's former position also supports finding that crime victim coordinator is a job in which an employee who lacked political loyalty would not be able to effectively carry out the requirements of the position. Plaintiff alleges she was responsible for "communicating with and assisting crime victims . . . by preparing them to testify at trial.[122] Numerous courts have found that jobs that require communicating or serving as a liaison for the public fall within the *Elrod/Branti* exception.[123] Plaintiff was the public face of the prosecutor's office in dealing directly with crime victims as well as serving as a liaison towards the public by preparing these victims for trial. This, too, supports finding that Plaintiff's position is one in which political loyalty is an appropriate job requirement.

Plaintiff also was in charge of securing funding and grants.[124] Numerous courts have found that managing budgets, including appropriating funds, is a factor in determining whether the position is one in which political loyalty is an appropriate requirement for the position.[125]

In sum, Plaintiff's job required Plaintiff to work closely with Escobar's office, implement his policies, serve as the public face of his office when working with crime victims, and raise funds for the office by writing grants. Each of these supports finding that Plaintiff's position as Coordinator of the CVU is one in which political affiliation "is an appropriate requirement."[126] Taken as a whole, it is difficult to imagine a district attorney's office being able to efficiently function if the person appointed to Plaintiff's former position was not trusted by and loyal to the

---

[122] Dkt. No. 1 p. 3, ¶ 10.

[123] *See, e.g.*, *Gordon*, 110 F.3d at 890 (employees who represented county in meetings with elected officials exempted); *Aiken*, 134 F. Supp.2d at 1222 (same); *Hoard*, 198 F.3d at 215 (6th Cir. 1999) (assistant road foreman was inherently political, and thus exempted because he served as a liaison with the public as far as road conditions were concerned).

[124] *Id.*

[125] *See, e.g.*, *Gentry,* 337 F.3d at 488; *Flores v. Sanchez*, No. EP-04-CA-056-PRM, 2005 U.S. Dist. LEXIS 15417, at *24 (W.D. Tex. July 29, 2005) (finding that an office manager is not protected from patronage dismissal and considering as one factor that the officer manager "assists with the preparation of an annual budget"); *Wiggins*, 363 F.3d at 390 (noting that "helping prepare a budget" was one factor in determining that a road manager is subject to patronage dismissal).

[126] *Rutan*, 497 U.S. at 64.

district attorney's office. Thus, the Court finds that Plaintiff's position falls within "the exceptional class of public servants of whom political allegiance may be demanded."[127]

This, however, does not end the analysis as Plaintiff may still state a claim if Escobar's actions were "unconnected to and unmotivated by [the] need for political loyalty."[128] However, the Court additionally finds that Plaintiff's allegations taken as true, and read in the light most favorable to Plaintiff, support finding that Plaintiff's activities had in "some way adversely affect[ed] the government's ability to provide services."[129]

Indeed, Plaintiff concedes Escobar's response to Plaintiff's "political disloyalty outside of the office" impeded the "efficient and effective functioning of the [CVU]."[130] Plaintiff also alleges that towards the end of her employment there was "little to no direct communication between [] Escobar and Plaintiff,"[131] and Plaintiff was only working half days.[132] Plaintiff acknowledges that "[t]he atmosphere was tense and awkward around the office with no communication with Escobar despite Plaintiff being the titular head of the CVU," and that she took a two and a half month leave of absence prior to her dismissal.[133] Plaintiff's allegations are that she was initially placed in her position because of her political loyalty to Escobar, and then later she was dismissed because her political disagreements with Escobar led to a breakdown in communication between the two. The lack of communication, in turn, led to a disruption in government services, including Plaintiff's more than two-month absence from her position.

---

[127] *Garcia v. Reeves County*, 32 F.3d 200, 205 (5th Cir. 1994).
[128] *Gentry*, 337 F.3d at 488.
[129] *Vojvodich*, 48 F.3d at 887.
[130] Dkt. No. 1 p. 10, ¶ 46.
[131] *Id.* at p. 11, ¶ 54.
[132] *Id.* at p. 12, ¶ 58.
[133] *Id.* ¶¶ 58–59. Although Plaintiff's complaint does not directly allege that the leave of absence was for the purpose of working on her sister's political campaign, the complaint states that the dates of Plaintiff's leave of absence overlapped with the dates that voting was open for her sister's campaign. *See id.* ¶ 60.

These allegations are sufficient to find that Plaintiff's role, in the circumstances as alleged, "necessitated an allegiance" to the district attorney's office.[134]

Based on the foregoing, Defendants have met their burden of demonstrating Plaintiff's position falls into the patronage dismissal exception outlined in *Elrod/Branti*, and Plaintiff's allegations fail to state a claim against Escobar. However, because Defendants raise the issue of qualified immunity, even though the Court finds that Plaintiff's allegations are insufficient to state a claim, the Court nonetheless will consider whether Escobar would be entitled to qualified immunity if Plaintiff had stated a claim.

### b.     Qualified Immunity

The Court concludes, even assuming, *arguendo* that Defendants had not demonstrated that Plaintiff's position was not protected from patronage dismissal, Escobar would be entitled to qualified immunity.

"A public official is protected by qualified immunity if a reasonable officer would have believed that his actions met constitutional standards. Significantly, the question is not whether the law was settled, viewed abstractly, but whether, measured by an objective standard, a reasonable officer would know that his action [was] illegal."[135] Thus, a plaintiff seeking to defeat qualified immunity has the burden to show that (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the challenged conduct.[136]

---

[134] *Grogan*, 617 F. App'x at 292.
[135] *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992).
[136] *Burnside*, 773 F.3d at 626–27; *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010) ("Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available.").

The Court has already determined that Plaintiff fails to meet the first prong of this analysis, however, the Court will nonetheless consider whether Escobar is entitled to qualified immunity under the second.

A right is clearly established if a reasonable official would understand that what he is doing violates that right.[137] An official's actions are held to be reasonable unless "all reasonable officials" in the same circumstances would have known that the conduct violated the plaintiff's asserted rights.[138] The focus of the analysis is on whether an official had "fair notice" that the conduct was unreasonable and is judged against "the backdrop of the law at the time of the conduct."[139] For an official to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances."[140]

Plaintiff points to no cases supporting that a constitutional violation was clearly established.[141] Additionally, a review of Fifth Circuit cases by this Court does not provide any case directly on point, and existing precedent does not place the statutory or constitutional question "beyond debate" at the time of the alleged violation.[142]

Public employee speech cases involve "a case-specific balancing of the employee's First Amendment rights and the government's interest in maintaining discipline and efficiency in the work place."[143] Accordingly, "[t]here will rarely be a basis for *a priori* judgment that the

---

[137] *Anderson v. Creighton*, 483 U.S. 635, 640 (U.S. 1987).
[138] *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).
[139] *Brosseau v. Haugen*, 543 U.S. 194, 198 (U.S. 2004).
[140] *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997).
[141] *See* Dkt. No. 15 p. 16.
[142] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).
[143] *Gunaca v. Texas*, 65 F.3d 467, 474 (5th Cir. 1995) (citing *Noyola v. Tex. Dep't of Human Res.*, 846 F.2d 1021, 1025 (5th Cir. 1988)).

termination or discipline of a public employee violated clearly established constitutional rights."[144]

However, although the inquiry is case-specific and requires a subjective analysis of the facts, Plaintiff's First Amendment right may still be "clearly established" if, at the time she was terminated, applicable and analogous case precedent gave Escobar sufficient notice that his actions would be a violation of Plaintiff's rights. In *Elrod/Branti* cases involving political speech, courts consider whether it was clearly established that the job the plaintiff held was the type of position exempted from First Amendment protection.[145]

Here, no such case precedent existed in the Fifth Circuit or in the Supreme Court at the time of Plaintiff's termination. Plaintiff did not raise, and the Court is unaware of, any Fifth Circuit case that has considered whether a victim assistance coordinator, as outlined under Texas law, is entitled to protection from patronage dismissal. However, numerous Fifth Circuit cases have found that a variety of positions related to government attorneys, including district attorneys, are not protected from patronage dismissal.[146]

Additionally, as noted, "a sufficient showing of disruption of the government's ability to provide services" is required to state a claim even where the public employee has been deemed a policymaker or a confidential employee.[147] Here, the allegations indicate a disruption of government services. The Court's review found no case finding that a policymaker or confidential employee who is discharged after political disagreements lead to a disruption of government services is, nonetheless, entitled to protection from patronage dismissal.

---

[144] *Noyola*, 846 F.2d at 1025 (internal quotations omitted).
[145] *Lloyd v. Birkman*, 127 F. Supp. 3d 725, 767 (W.D. Tex. 2015); *see e.g., Gentry*, 337 F.3d at 487–88 (concluding that a road manager was exempt, but that regardless, the defendants would have been entitled to qualified immunity because a sufficiently analogous situation had never been addressed); *Gunaca v. Texas*, 65 F.3d 467 (5th Cir. 1995) (finding qualified immunity appropriate because it was not clearly established whether the political patronage exception applied to investigators in district attorney's offices or sufficiently analogous circumstances).
[146] *See Aucoin*, 306 F.3d at 275.
[147] *See Vojvodich*, 48 F.3d at 886.

In summary, the fact pattern here is entirely unique. In these circumstances, Escobar would not have had notice that dismissing Plaintiff would be a constitutional violation. Thus, in the absence of any case on point, and no similar controlling precedent, the Court determines that even if Plaintiff had stated a claim, Escobar would be entitled to qualified immunity.

The Court considers one additional issue. Qualified immunity, an extremely fact specific inquiry, has been raised here on a motion for judgment on the pleadings, which is an analysis based on the face of the pleadings. Because of the fact-intensive nature of qualified immunity analysis, when a defendant asserts qualified immunity on a motion based on the pleadings, the trial court can, in its discretion, order the plaintiff to submit a reply refuting the immunity claim "with factual detail and particularity."[148]

The Court declines to exercise its discretion in this instance. Plaintiff has responded to Defendants' assertion of immunity with particular arguments.[149] Notably, in her response Plaintiff raises no facts that are disputed or would be resolved with additional discovery.[150] Further, the Court has conducted its own review and found the facts as asserted by Plaintiff would not support finding any violation was clearly established under existing law. Thus, requiring Plaintiff to file an additional response would serve no purpose.

Based on the foregoing, Plaintiff's claim against Escobar in his individual capacity is **DISMISSED WITH PREJUDICE**. The Court turns to Plaintiff's claim against Starr County.

### ii.     Claim Against Starr County

Counties may not be sued under § 1983 for an injury inflicted solely by its employees or agents, however, counties may be liable if their policies or customs *caused* the underlying

---

[148] *Johnson v. Halstead*, 911 F.3d 267, 273 (5th Cir. 2018); *see also Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc).
[149] *See* Dkt. No. 15.
[150] *See id.*

constitutional violation.[151] Municipal liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation.[152] "Municipal liability under § 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[153]

Plaintiff's claim against Starr County must be dismissed. First, Plaintiff's claim requires the violation of an underlying constitutional right,[154] which the Court has concluded is lacking here. Second, Plaintiff points to no policymaker or official policy that was the moving force of the alleged violation.[155] Absent these elements, Plaintiff's claim against Starr County must be **DISMISSED WITH PREJUDICE**.

## IV. HOLDING

For the foregoing reasons, Defendants' motion for judgment on the pleadings is **GRANTED** and all Plaintiff's claims, and her entire complaint, are **DISMISSED WITH PREJUDICE**. Additionally, the parties' motion for a stay[156] is **DENIED as moot**. Pursuant to Rule 58, a final judgment will issue separately.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 30th day of April, 2019.

Micaela Alvarez
United States District Judge

---

[151] *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91, 694 (1978).
[152] *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 391–92 (1989).
[153] *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).
[154] *See City of Canton, Ohio,* 489 U.S. at 386-90.
[155] *Delano-Pyle*, 302 F.3d at 574. The Court recognizes that in relation to certain duties a district attorney may be a county policy maker, but Plaintiff offers no such factual allegations here.
[156] Dkt. No. 20.